RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DOROTHY CLARK,

        *Plaintiff-Appellee,*

    *v.*

CHRYSLER CORPORATION,

        *Defendant-Appellant.*

No. 04-5279

>

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 94-00346—Karl S. Forester, District Judge.

Argued: April 22, 2005

Decided and Filed: February 1, 2006

Before: KENNEDY and MOORE, Circuit Judges; RESTANI, Chief Judge.[*]

_____

## COUNSEL

**ARGUED:** Theodore J. Boutrous, Jr., GIBSON, DUNN & CRUTCHER, Washington, D.C., for Appellant. Richard Hay, LAW OFFICE OF RICHARD HAY, Somerset, Kentucky, for Appellee. **ON BRIEF:** Theodore J. Boutrous, Jr., Thomas H. Dupree, Jr., GIBSON, DUNN & CRUTCHER, Washington, D.C., Lawrence A. Sutter, SUTTER, O'CONNELL, MANNION & FARCHIONE, Cleveland, Ohio, for Appellant. Richard Hay, LAW OFFICE OF RICHARD HAY, Somerset, Kentucky, for Appellee.

    RESTANI, C. J., delivered the opinion of the court. KENNEDY, J. (pp. 16-18), delivered a separate opinion concurring in part and concurring in the judgment. MOORE, J. (pp. 19-29), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

    RESTANI, Chief Judge. Chrysler Corporation appeals the district court's order, entered on remand, upholding Dorothy Clark's $3 million punitive damage award as reasonable and proportionate to the wrong committed and denying Chrysler's motions for judgment as a matter of

---

[*] The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

law, for remittitur, and for a new trial. Because we conclude that the punitive damage award is constitutionally excessive, we remit the amount of punitive damages to $471,258.26.

# I. BACKGROUND[1]

On October 14, 1993, Charles Clark was fatally injured in an automobile accident while driving a 1992 Dodge Ram club cab pickup truck. The accident occurred when Mr. Clark pulled into an intersection in front of an oncoming vehicle and the two vehicles collided. Mr. Clark, who was not wearing a seat belt, was ejected from his vehicle and died a short time later.

Mr. Clark's wife sued Chrysler, claiming that its pickup truck was defectively and negligently designed. On October 1, 1997, after a three-day trial, the jury rendered a unanimous verdict in favor of Mrs. Clark on claims of strict liability, negligence, and failure to warn. The jury found that Chrysler and Mr. Clark were each 50% at fault and returned a verdict of $471,258.26 in compensatory damages and $3,000,000 in punitive damages. The court entered a judgment against Chrysler for $3,235,629.13, reflecting 50% of the compensatory damages plus the $3 million punitive damages award.

After trial, Chrysler renewed its request for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 and for a new trial pursuant to Federal Rule of Civil Procedure 59. In its motion for judgment as a matter of law, Chrysler argued that because there was no evidence of "gross negligence," an award of punitive damages was improper. [J.A. at 81–85.] Chrysler alternatively argued for a new trial in its Rule 59 motion. The district court denied both motions. [J.A. 87–92.] On appeal, we affirmed the district court's judgment and upheld the jury's compensatory and punitive damage awards.

Several months later, the Supreme Court decided *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003). In *State Farm*, the Court elaborated on the procedural and substantive constraints that the Due Process Clause imposes on punitive damage awards. After *State Farm* was issued, Chrysler petitioned for a writ of certiorari, requesting that the Court "grant certiorari, vacate the decision below, and remand for further consideration ("GVR") in light of its recent decision in *State Farm v. Campbell*." Pet. for Writ of Cert., No. 02-1748, 2003 WL 22428164, at *2 (U.S. May 21, 2003).[2] In its petition, Chrysler insisted that the jury's $3 million punitive damage award was constitutionally excessive. *Id.* at *18–*25. Clark opposed the petition, arguing that Chrysler had waived its constitutional challenge by failing to raise it in its post-judgment motions before the district court, and that even if the issue was preserved for review, the amount of the punitive damage award was within constitutional boundaries. *See* Resp't Br. in Opp'n to Pet. for Writ of Cert., No. 02-1748, 2003 WL 22428165, at *19–*30 (U.S. July 1, 2003).

On October 6, 2003, the Supreme Court granted Chrysler's petition, vacated our judgment, and remanded the case to us "for further consideration in light of *State Farm*." *Chrysler Corp. v. Clark*, 540 U.S. 801 (2003). We, in turn, remanded the case to the district court for further proceedings in accordance with the Supreme Court's order. *See Clark v. Chrysler Corp.*, 80 Fed. Appx. 453 (6th Cir. 2003). On February 6, 2004, the district court upheld the jury's award, and

---

[1] Because we previously discussed the background of this dispute in detail in *Clark v. Chrysler Corp.*, 310 F.3d 461 (6th Cir. 2002), we now discuss only the facts relevant to the instant disposition.

[2] In its petition, Chrysler also asked the Court to grant plenary review to consider whether federal courts sitting in diversity should apply a federal or state sufficiency of the evidence standard in ruling on a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. *Id.* at *8–*18.

denied Chrysler's motions for judgment as a matter of law, for remittitur, and for a new trial. *See* Dist. Ct. Op. & Order (Feb. 6, 2004), J.A. at 31–43. Chrysler timely appealed.[3]

## II. DISCUSSION

In *State Farm*, the Supreme Court elaborated on the measure of punishment, by means of punitive damages, that a state may impose upon a defendant in a civil case. The Court reiterated the principle that, "[w]hile States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." 538 U.S. at 416 (citations omitted). The Court also expressed its concern with the manner in which punitive damages systems are administered, noting that vague instructions "do little to aid [a jury] in its task of assigning appropriate weight to evidence that is relevant and evidence that is tangential or only inflammatory." *Id.* at 417–18. In light of these concerns, the Court applied the three guideposts set forth in *BMW v. Gore*,[4] and concluded that a punitive damage award of $145 million, where compensatory damages were $1 million, was constitutionally excessive. *Id.* at 418–29.

Because of *State Farm*'s narrow focus on punitive damages and the Court's limited GVR order, we do not reconsider our earlier holdings regarding liability, compensatory damages, or the sufficiency of evidence to support some award of punitive damages.[5] We must, however, decide whether *State Farm* requires us to change our conclusion that the amount of the punitive damage award was within constitutional limits. We conclude that it does.

In the discussion below, we explain that (A) Chrysler's claim regarding the constitutionality of the award has been preserved for review; (B) the award is constitutionally excessive and should be reduced to $471,258.26 and (C) a new trial on the amount of punitive damages is warranted only if the reduced award is rejected by Mrs. Clark.

### A.      Chrysler's claim regarding the constitutionality of the award has been preserved for review

The parties dispute whether Chrysler properly preserved its claim that the punitive damage award is constitutionally excessive. We conclude that even though Chrysler initially waived this challenge by failing to raise it in its post-trial motions before the district court, subsequent proceedings in the Sixth Circuit and Supreme Court preserved the issue for review.

Challenges to the excessiveness of verdicts must be brought in the trial court through post-trial motions. *Young v. Langley*, 793 F.2d 792, 794 (6th Cir. 1986). This procedure allows the trial judge an opportunity to initially correct errors, exercise his discretion, and create a full record for appeal. *Id.* Absent the timely filing of a post-trial motion and the trial court's ruling thereon, an appellate court will generally not review the alleged excessiveness of damages awards. *Id.*; *see also*

---

[3] We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 (2000).

[4] The *Gore* Court instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996).

[5] Thus, we reinstate our earlier opinion with the exception of Part V.B.2, which addressed the Due Process Clause issue.

*O'Connor v. Huard*, 117 F.3d 12, 18 (1st Cir. 1997) ("We generally will not review a party's contention that the damages award is excessive or insufficient where the party has failed to allow the district court to rule on the matter."); *DeWitt v. Brown*, 669 F.2d 516, 524 (8th Cir. 1982) (citations omitted) (noting that the "inadequacy or excessiveness of a verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and which knows the community and its standards").

In *Local Union No. 38, Sheet Metal Workers' International Ass'n v. Pelella*, for example, the Second Circuit refused to decide whether the punitive damage award was constitutionally excessive because the appellant failed to raise the issue in its post-trial motions before the district court. 350 F.3d 73, 89–90 (2d Cir. 2003), *cert. denied*, 541 U.S. 1086 (2004). Although *State Farm* was decided during the course of the appeal and the appellant raised the issue in its reply brief, the *Pelella* court held that the matter had been waived. *See id.* The court reasoned that the appellant "could unquestionably have invoked *Gore* in the district court proceedings to suggest that the jury's punitive award was constitutionally excessive." *Id.* at 90.

Similarly, in this case Chrysler did not challenge the punitive damage award as constitutionally excessive in either of its post-trial motions. *See* J.A. at 63–74, 75–86. Unlike in *Pelella*, however, we nevertheless addressed the issue on appeal. Specifically, we stated that,

> Chrysler also maintains that . . . the jury's award was so excessive as to violate the Due Process Clause. [We do] not agree. . . . In none of its briefing does Chrysler indicate why, under *Gore*, a due process violation occurred in this case. However, a review of the [three] factors quickly reveals that this case is a far cry from *Gore*.

*Clark*, 310 F.3d at 481–82. As a result, although Chrysler waived its constitutional challenge by failing to raise it in its post-trial motions before the district court,[6] our passing on the issue essentially preserved it for Supreme Court review. *See United States v. Williams*, 504 U.S. 36, 41 (1992) ("Our traditional rule . . . precludes a grant of certiorari only when the question presented was not pressed or passed upon below.") (quotations and citations omitted); *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1099 n.8 (1991) (rejecting respondents argument that it should decline to address an issue that was not raised below because "[i]t suffices for our purposes that the court below passed on the issue presented, particularly where the issue is . . . in a state of evolving definition and uncertainty, and one of importance to the administration of federal law") (quotations and citations omitted); *Payton v. New York,* 445 U.S. 573, 582 n.19 (1980) ("Although it is not clear from the record that appellants raised this constitutional issue in the trial courts, since the highest court of the State passed on it, there is no doubt that it is properly presented for review by this Court.") (citation omitted).

Furthermore, the Supreme Court's GVR order suggests that the issue has been preserved for reconsideration on remand. In this case, the Court granted Chrysler's request for a GVR order; whereas in two other cases, the Court denied similar requests where the appeals courts refused to pass on the constitutional issue. In *Pelella*, for instance, the Second Circuit refused to decide whether the punitive damage award was constitutionally excessive because the appellant, Local Union, did not raise the issue in the trial court. *See* discussion *supra* Part II.A. On petition to the Supreme Court, Local Union's request for a GVR order in light of *State Farm* was denied. *See* Pet. for Writ of Cert., No. 03-1472, 2004 WL 892040, at *16 (U.S. Apr. 20, 2004) (asking Supreme Court to either resolve whether punitive damages are constitutionally permissible or remand to

---

[6]Because the Supreme Court had already decided *Gore*, Chrysler could have invoked the three factors to challenge the constitutionality of the punitive damages award. *See Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477–78 (6th Cir. 2004) (explaining that "*State Farm* did not work a change in the law so much as it clarified existing law set forth in [*Gore*]").

Second Circuit for reconsideration in light of *State Farm*); *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella*, 541 U.S. 1086 (2004), *denying cert. to* 350 F.3d 73 (2d Cir. 2003). Similarly, in *Time Warner Entertainment Co. v. Six Flags Over Georgia, LLC*, the Georgia Court of Appeals held that Time Warner waived its constitutional challenge by failing to cite any relevant facts, provide record citations, or present any legal analysis in support of its argument. 563 S.E.2d 178, 184 (Ga. Ct. App. 2002). Time Warner's petition to the Supreme Court, requesting a GVR order for further consideration in light of *State Farm*, was denied. *See* Pet. for Writ of Cert., No. 02-0978, 2002 WL 32133807, at \*25–\*27 (U.S. Dec. 23, 2002) (requesting, at a minimum, a GVR in light of *State Farm*); *Time Warner Entm't Co. v. Six Flags Over Ga.*, 538 U.S. 977 (2003) (denying cert.).

Therefore, even though Chrysler initially waived its constitutional claim by failing to raise it in the district court, our earlier decision and the Supreme Court's GVR order indicates that the issue has been preserved, and should be considered further on remand. *See Lawrence v. Chater*, 516 U.S. 163, 168 (1996) (explaining that "GVR orders are premised on matters that [the Court] . . . believe[s] the court below did not fully consider, and . . . require only further consideration").

## B.     The punitive damage award is constitutionally excessive

As discussed above, the Court in *State Farm* elaborated on the three *Gore* guideposts that courts must consider when reviewing punitive damage awards. Namely, (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *See Gore*, 517 U.S. at 574–75. In light of *State Farm*, and after a *de novo* review, *Cooper Industries, Inc. v. Leatherman Tool Group Inc.*, 532 U.S. 424, 431 (2001), we conclude that the \$3 million award here is constitutionally excessive. An application of the *Gore* guideposts to the facts of this case reveals that a punitive damage award approximately equal to twice the amount of compensatory damages, or \$471,258.26, would comport with the requirements of due process.

### 1.     Degree of reprehensibility

With respect to the first *Gore* guidepost, *State Farm* emphasized that the degree of reprehensibility is "[t]he most important indicium of the reasonableness of a punitive damages award." 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575). The Court laid out a list of five criteria that lower courts must consider in determining the reprehensibility of a defendant's conduct:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*Id.* (citation omitted). In our original opinion, we concluded that Chrysler's conduct was reprehensible because the loss of life evidenced a greater disregard for the rights and safety of others than the economic damage sustained in *Gore*. *See Clark*, 310 F.3d at 482. *State Farm* does not change our conclusion that the physical harm suffered by Mr. Clark weighs strongly in favor of finding Chrysler's conduct reprehensible. After considering the four other factors, however, we conclude that the factors as a whole show that Chrysler's conduct was not sufficiently reprehensible to warrant a \$3 million punishment.

### a.          Physical or economic harm

Because Chrysler's conduct resulted in physical harm and ultimately the loss of Mr. Clark's life, this factor weighs heavily in favor of finding Chrysler's conduct reprehensible. *Cf. Gore*, 517 U.S. at 576 (the harm inflicted was "purely economic in nature"); *State Farm*, 538 U.S. at 426 (same).

### b.          Indifference to or reckless disregard for the safety of others

At trial, Clark introduced evidence that the 1992 Dodge Ram door latch and the metal frame of the truck against which the latch closed—the B-pillar—were improperly designed, such that the forces of the accident caused the B-pillar to deform, or "twist out," and force open the latch, allowing Mr. Clark to be thrown from the truck. Clark's experts testified that Chrysler utilized a thin piece of formed sheet metal as a B-pillar; that the truck's "unboxed" B-pillar design was inadequate to withstand low-impact accidents; that the sheet metal type of B-pillar was substantially outdated and had been removed from the modern state of the art and state of the industry for over 40 years; that every other manufacturer utilized reinforced, boxed-in, or supported B-pillar designs that did not experience bypass failure; and that B-pillar twist-out was a known failure in the automotive industry. In addition, a Chrysler representative testified that his group did not test for latch failures involving B-pillar twist-out. Also, a member of the Chrysler Safety Office stated that a B-pillar is generally a boxed-in section of metal, and that an unboxed piece of metal is weak in almost every direction. Finally, there was evidence introduced at trial that Chrysler knew that if a driver was ejected, the risk of death substantially increased.[7]

As we stated in our earlier opinion, this evidence is sufficient to support the jury's decision to award punitive damages.[8] In other words, viewing this evidence in the light most favorable to Clark, there is not a "complete absence of proof" that Chrysler's use of a weak and outdated, unboxed B-pillar constituted a reckless disregard for the safety of others, including Mr. Clark.[9]

---

[7] The Court in *Cooper Indus., Inc.*, 532 U.S. at 440 n.14 instructed courts of appeals to "defer to the District Court's factual findings, unless they are clearly erroneous." The Court further explained that "with respect to the first *Gore* inquiry . . . the district courts have somewhat superior vantage over courts of appeals," where such "advantage exists primarily with respect to issues turning on witness credibility and demeanor." *Id.* at 440; *accord Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 230–31 (3d Cir. 2005); *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1150 (9th Cir. 2002). In this case, this advantage does not exist because the district court judge who authored the opinion under review is not the same judge who presided over the trial. *See* J.A. 21; *see also Bankcard America, Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 481 (7th Cir. 2000) ("[b]ecause [the district court] did not preside over the . . . trial, he enjoyed no special advantage in determining credibility and gauging the evidence" and "deference is not warranted"); *Henry A. Knott Co. v. Chesapeake & Potomac Tel. Co.*, 772 F.2d 78, 85 (4th Cir. 1985) ("The problem of the successor judge . . . is that one person hears the testimony and another person makes the factual findings without having seen or heard the witness . . . . Deference to such findings, by a district court or an appellate court, would be misplaced in such a case."). Nonetheless, our rendition of the facts parallels the factual findings of the district court. *See* Dist. Ct. Op. & Order, at 4–5, J.A. at 34–35.

[8] The court instructed the jury that it could return a verdict for punitive damages if the "conduct of Chrysler Corporation in designing, manufacturing or marketing the 1992 Dodge Ram pickup truck constituted gross negligence." J.A. at 58. Gross negligence was defined as "a reckless disregard for the lives and safety of other persons, including Charles Clark." *Id.*

[9] In a diversity case, when a Rule 50 motion for judgment as a matter of law is based on the sufficiency of the evidence, we apply the standard of review of the state whose substantive law governs the matter—in this case, Kentucky. *Am. Trim*, 383 F.3d at 471. Under Kentucky law, judgment should be granted "only if there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ." *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998) (internal quotations omitted). The court cannot substitute its judgment for that of the jury; rather, it must review the evidence in the light most favorable to the non-moving party, who must be accorded every reasonable inference from the evidence. *Id.*

Consequently, we previously affirmed the district court's denial of Chrysler's motion for judgment as a matter of law, to the extent it was based on the sufficiency of the evidence to support a punitive damages award.[10] On the other hand, because there is no evidence that a boxed-in B-pillar would have prevented the harm suffered by Mr. Clark, and because there is a good-faith dispute over whether B-pillar testing is necessary, we disagree with the district court's decision that Chrysler's conduct is sufficiently indifferent or reckless to support a $3 million award.

First, although the evidence indicates that Chrysler utilized a weak, unboxed B-pillar design, there is no proof that even a stronger, boxed-in B-pillar would have prevented Mr. Clark's accident. Although Clark's experts testified as to their belief that the un-boxed B-pillar was weak, they did not conduct any tests to see whether another B-pillar would have prevented a door latch from opening under similar circumstances. *See* J.A. at 145 ("I believe [that Chrysler's B-latch] was unreasonably dangerous . . . [b]ecause there were better systems out there . . . that *probably* would have prevented this ejection.") (emphasis added); J.A. at 336–42 (testifying that "[t]o understand the strength of [a pillar] you need to run tests," but admitting that no tests were conducted to determine whether a boxed-in B-pillar would have prevented a door from opening during a similar impact). In the absence of evidence that a different design would have prevented Mr. Clark's accident, we cannot conclude that Chrysler's use of an unboxed B-pillar shows a level of indifference or reckless disregard sufficient to establish reprehensibility.[11]

Second, although Chrysler failed to conduct a B-pillar twist-out test, the record shows that there was a good-faith dispute over whether such testing was necessary. In 1987, General Motors ("GM") informed the National Highway Traffic Safety Administration ("NHTSA"), as well as other automobile manufacturers, including Chrysler, that it had developed a "Horizontal Rotation Test" as a way of simulating and ultimately reducing the incidence of latch bypass. [J.A. at 232–36, 394–95, 443.] In response, NHTSA conducted an evaluation of the GM test to determine whether the government should replace, or supplement, its existing testing requirements. *See* Denial of Motor Vehicle Defect Petition, 61 Fed. Reg. 64,563, 64,565 (Dep't Transp. Dec. 5, 1996). Ultimately, NHTSA decided against requiring the GM test. [J.A. 331–32.] As a result, GM is the only automobile manufacturer that conducts the test. [J.A. 333.] Therefore, although it is possible that GM's test may have alerted Chrysler to the deficiencies of its B-pillar design and prevented Mr. Clark's accident, because the test was neither required by the government nor used by other manufacturers, we cannot conclude that Chrysler's failure to adopt the test indicates a level of indifference to or reckless disregard for the safety of others sufficient to weigh in favor of reprehensibility.[12] *See Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 710 (5th Cir. 1997) (reversing punitive damage award where there was no evidence the defendant acted with malice or reckless indifference to plaintiff's rights and where the evidence demonstrated a "good faith dispute" as to whether the defendant's conduct violated plaintiff's rights under the ADA); *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1317 (5th Cir. 1995) (vacating award of punitive damages against

---

[10]Our explanation here of this earlier holding is only for clarity, as *State Farm* does not require us to reconsider our decision on this ground. *State Farm* was concerned with the amount of the award, not the jury's decision to return punitive damages. *See* 538 U.S. at 419–20 ("While we do not suggest there was error in awarding punitive damages[,] . . . a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives . . . ."). Indeed, the Court remanded the matter for "[t]he proper *calculation* of punitive damages." *Id.* at 429 (emphasis added).

[11]In noting this absence of evidence, we are not revisiting our earlier holding that the trial court properly admitted the testimony of Clark's experts. *See Clark*, 310 F.3d at 466. Rather, in accordance with the Supreme Court's GVR Order, our analysis focuses on whether Chrysler's conduct was indifferent or reckless to the requisite degree to support the award.

[12]It is undisputed that Chrysler complied with federal testing requirements. [J.A. at 156.] Although 49 U.S.C. § 30103(e) provides that "[c]ompliance with a motor vehicle safety standard . . . does not exempt a person from *liability* at common law," the issue here is punitive damages (emphasis added).

motorcycle manufacturer after concluding, *inter alia*, that a genuine dispute existed in the scientific community as to whether leg guards do more harm than good, no government or agency had ever required them, and the industry as a whole had categorically rejected them as unnecessary).

Thus, in the absence of evidence that a boxed-in or supported B-pillar would have prevented the harm suffered by Mr. Clark, and because there is a good-faith dispute over whether B-pillar testing is necessary, we conclude that Chrysler's conduct does not evince a level of indifference to or reckless disregard for the safety of others to permit a $3 million punitive damage award.

### c.          Financially vulnerable target

With respect to financial vulnerability, the district court held that this factor weighed in favor of finding Chrysler's conduct reprehensible because Mr. Clark was a purchaser of one of Chrysler's vehicles and Chrysler has substantial financial resources. Because Chrysler's wealth has no connection to the actual harm sustained by Mr. Clark, we disagree.

The financial vulnerability of a target is particularly relevant when the harm inflicted is economic in nature. *See Gore*, 517 U.S. at 576 (explaining that the "infliction of economic injury, especially when done intentionally . . . or when the target is financially vulnerable, can warrant a substantial penalty"). Even when a plaintiff endures economic injury, however, "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at 427; *see also Gore*, 517 U.S. at 585 ("The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice . . . ."); *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 676 (7th Cir. 2003) ("a person is punished for what he does, not for who he is, even if the who is a huge corporation"). Rather, to serve as justification for a punitive damage award, a defendant's wealth must bear some relation to the harm sustained by the plaintiff. *See State Farm*, 538 U.S. at 427. In this case, economic injury is not involved, and as our discussion in *supra* Part II.B.1.a. indicates, no other connection between Chrysler's financial resources and the physical injury suffered by Mr. Clark was established. Thus, Chrysler's wealth is an inappropriate basis for the $3 million punitive damage award and this factor weighs against finding Chrysler reprehensible.

### d.          Repeated actions or isolated incident

The district court also held that Chrysler's conduct was not isolated because it was aware that there was no correlation between its door latch testing and the strength of its B-pillar, and thus Chrysler put anyone who drove a Dodge Ram pickup truck at risk. Because there is no evidence that Chrysler repeatedly engaged in misconduct while knowing or suspecting that it was unlawful, we conclude to the contrary.

"[E]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Gore*, 517 U.S. at 576–77. In determining whether a defendant engaged in repeated misconduct, "courts must ensure the conduct in question replicates the prior transgressions." *State Farm*, 538 U.S. at 423. In this case, there is no evidence that Chrysler knew that its use of the un-boxed B-pillar could cause Mr. Clark's injury.[13] Indeed, there is no evidence of earlier, similar accidents that might have alerted Chrysler

---

[13]Citing *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky. 1984), Clark argues that under Kentucky substantive products liability law, Chrysler is "*presumed to know* the qualities and characteristics, and the actual condition, of [its] product at the time [it] sells it." Appellee's Resp. Br. at 29 n.33. It is undisputed that Chrysler knew that its B-pillar was weak. The issue, however, is whether Chrysler knew that such a weakness could cause the harm suffered by Mr. Clark. There is no evidence that it did. In fact, as discussed above, there is no proof that the use

to the problem.[14]  And as discussed above, because Chrysler was not under any duty to conduct B-pillar testing, its failure to do so does not show any disrespect for the law.  This absence of evidence of repeated misconduct weighs against finding Chrysler's conduct reprehensible.

### e.          Intentional malice, trickery, or deceit

Although the district court concluded that Chrysler did not act with intentional malice, trickery, or deceit, it held that Clark's death was not the result of a mere accident.  We agree that Chrysler ignored potential hazards presented by a weak B-pillar.  Indeed, we upheld the jury's decision to award punitive damages.  But, we disagree that this factor weighs in favor of finding Chrysler's conduct reprehensible.

The concept that trickery and deceit are more reprehensible than negligence reflects the principle that punitive damages may not be "grossly out of proportion to the severity of the offense." *Gore*, 517 U.S. at 576 (quotations and citations omitted).  In *Gore*, the Court concluded that the defendant's conduct was not sufficiently reprehensible to warrant a $2 million award and noted the absence of "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive." *Id.* at 579.  Thereafter, in *State Farm*, the Court added "intentional malice, trickery, or deceit" to the list of factors that courts should consider. 538 U.S. at 419; s*ee also Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 345 F.3d 1366, 1371 (Fed. Cir. 2003) ("For the Court's majority, [intentional malice, trickery, or deceit] has become an important criterion of what the Constitution accepts as reprehensible conduct.").  In *State Farm*, even though there was evidence that the defendant had altered company records and engaged in acts that amplified the plaintiffs' harm, the Court held that such conduct did not warrant a $145 million award.  *See* 538 U.S. at 419–20.  Unlike in *State Farm*, there is no evidence here that Chrysler engaged in any acts of intentional malice, trickery, or deceit.  On the other hand, the evidence indicates that Chrysler knew that its B-pillar design was weak.  Therefore, we conclude that this factor is neutral, favoring neither party.

In sum, only the first of the five factors weighs in favor of reprehensibility.  The factors viewed as a whole indicate that Chrysler's conduct was not sufficiently reprehensible to support such a large punitive damage award.[15]

### 2.          Ratio: The disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award

The second guidepost is the disparity between the actual or potential harm inflicted on the plaintiff and the punitive damage award.  Although the Supreme Court has not identified a concrete ratio, it has emphasized that "an award of four times the amount of compensatory damages might

---

of a reinforced boxed-in B-pillar would have prevented Mr. Clark's injury.  *See* discussion *supra* Part II.B.1.a; *see also Gore*, 517 U.S. at 579 (rejecting plaintiff's argument that defendant should be treated as a recidivist because it "*should have anticipated* that its actions would be considered fraudulent") (emphasis added).

[14]Although Clark's witnesses testified about several other accidents in which Chrysler vehicles experienced bypass twist-out failures, these accidents occurred subsequent to Mr. Clark's, and are not "prior transgressions" that would have alerted Chrysler to the defect. [J.A. 132–133, 240].

[15]We also note that although the parties agreed to the language of the jury instruction, the instruction provided the jury with little guidance for determining an appropriate amount of punitive damages.  *See supra* note 6.  A more informative instruction may have focused the jury on the level of Chrysler's reprehensibility and prevented such an excessive award.  *See State Farm*, 538 U.S. at 418 (expressing concern over "[v]ague instructions" that do little to help the jury to avoid assigning too much weight to evidence that may have "little bearing as to the amount of punitive damages that should be awarded").

be close to the line of constitutional impropriety." *State Farm*, 538 U.S. at 425 (noting "long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish"); *Gore*, 517 U.S. at 581 (citing 4-1 ratio); *Haslip*, 499 U.S. at 23–24 (concluding that although an award of "more than four times the amount of compensatory damages" might be "close to the line," it did not "cross the line into the area of constitutional impropriety"). In *State Farm*, the Court "decline[d] again to impose a bright-line ratio which a punitive damages award cannot exceed,"but noted that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 U.S. at 425.

In this case, the district court held that the 13:1 ratio was appropriate because it "does not stray far from the single digit ratio . . . recommended in *State Farm*," and because it is not the type of "breathtaking" award found in either *Gore* (500:1) or in *State Farm* (145:1). Dist. Ct. Op. & Order at 9, J.A. at 39. We agree with the district court, and with our earlier opinion, that the ratio here is not comparable to other "breathtaking" awards. *State Farm* makes clear, however, that this guidepost involves more than a simple comparison to other ratios: "The precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." 538 U.S. at 425. Based on the facts here, we conclude that a ratio of approximately 2:1 is appropriate, as will be explained further.

With respect to Chrysler's conduct, as discussed above, there is no evidence that Chrysler acted with intentional malice, trickery or deceit, or intended to harm Mr. Clark. *See* discussion *supra* Part II.B.1.d. Thus, a 13:1 ratio is not justified on the basis of Chrysler's reprehensible or "particularly egregious" conduct. *See State Farm*, 538 U.S. at 425 (quoting *Gore*, 517 U.S. at 582) (noting that higher ratios "may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages'"). In fact, Chrysler's conduct is not sufficiently egregious to justify even a ratio of 4:1, which in many cases may be the limit of constitutional propriety.

On the other hand, in view of the severe noneconomic harm suffered by the Clarks, the compensatory award of $235,629.13 is not overly large.[16] *See State Farm* (quoting *Gore*, 517 U.S. at 582) (explaining that "a higher ratio *might* be necessary where 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine'"). In contrast, in *State Farm*, the jury awarded $1 million in compensatory damages to plaintiffs who suffered economic harm. In that case, the Court concluded that "in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), a punitive damages award at or near the amount of compensatory damages" was justified. *Id.* at 429. Other courts have reduced punitive damage awards to a 1:1 ratio where compensatory damages are "substantial." *See Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (holding that "substantial compensatory damages award" of over $4 million entered against tobacco company, in favor of widower whose wife died from lung cancer required punitive damages to be reduced to a ratio of approximately 1:1); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 799 (8th Cir. 2004) (concluding that "large compensatory award" of $600,000 in racial harassment claim "is a lot of

---

[16]As noted above, the court reduced the compensatory damages award of $471,258.26 to $235,629.13 in accordance with the jury's finding that Mr. Clark was 50% at fault. We use this reduced amount to determine the appropriate ratio because a ratio based on the full compensatory award would improperly punish Chrysler for conduct that the jury determined to be the fault of the plaintiff. *See Gore*, 517 U.S. at 575 (quotations and citations omitted) ("exemplary damages imposed on a defendant should reflect the enormity of the offense"). Because Mrs. Clark received only $100,000 damages for loss of aid, assistance, services, and companionship for the period before Mr. Clark's death and no damages for the period of his life expectancy (except for pecuniary losses), J.A. at 424, the total damages may be smaller than in death cases from other jurisdictions where loss of companionship, etc. for the years after death can yield large damage amounts. Nonetheless, the punitive damage award is not to be inflated to compensate a plaintiff for damages not permitted by the relevant jurisdiction.

money" and reducing punitive damages to 1:1 ratio); *see also Phelps v. Louisville Water Co.*, 103 S.W. 3d 46, 54 (Ky. 2003) (noting "the relatively small amount of compensatory damages awarded" to determine appropriate ratio). The compensatory award here is not very substantial.

In short, because the compensatory damage award here is not particularly large, a 1:1 ratio is inappropriate. But due to the lack of several of reprehensibility factors, any ratio higher than 2:1 is unwarranted. Accordingly, we conclude that a ratio of approximately 2:1 would comport with the requirements of due process.

### 3.        Sanctions for comparable misconduct

The third guidepost is the difference between the punitive damage award and the civil or criminal penalties that could be imposed for comparable misconduct. In making this comparison, a reviewing court "should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Gore*, 517 U.S. at 583 (internal quotations and citation omitted). In *State Farm*, the Court limited this comparison to civil penalties, explaining that although "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action[, w]hen used to determine the dollar amount of the award, . . . the criminal penalty has less utility." 538 U.S. at 428. The Court also explained that "the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." *Id.*

In our previous opinion, we concluded that this guidepost weighed in favor of Clark because "automobile manufacturers are generally on notice that their reckless conduct resulting in death could trigger a substantial punitive damages award." *Clark*, 310 F.3d at 482. Given *State Farm's* focus on civil penalties, however, we now conclude that a $3 million punitive damage award is excessive in light of comparable civil penalties.[17]

At the time of the truck's design and manufacture, the maximum civil penalty that could be imposed for a design defect was $1,000 per vehicle, up to a maximum of $800,000 for a related series of violations. *See* 49 U.S.C. § 30165(a) (1994). The $3 million award here is significantly larger than those figures.

The district court surmised that Chrysler could potentially be subjected to a larger civil penalty if it gained financially from using the defective B-pillar, or if its corporate license was suspended or revoked. Neither party, however, presented evidence regarding whether Chrysler gained financially from installing the unboxed B-pillar, or the likelihood of Chrysler losing its corporate license.[18] Furthermore, in *State Farm*, the Court warned the lower court against "speculat[ing] about the loss of [the defendant's] business licence, the disgorgement of profits, and

---

[17]Clark suggests that this guidepost is insignificant because, although the Court in *State Farm* observed that the defendant may have been subject to a $10,000 fine under comparable state laws, it approved a punitive damage award "at or near the amount of compensatory damages," which was 100 times greater than the comparable civil penalty. Appellee's Resp. Br. at 33–34. This guidepost, however, does not dictate what the punitive damage award should be, but rather indicates whether the award is unreasonably excessive. *See Gore*, 517 U.S. at 583 (describing third guidepost as an "indicium of excessiveness").

[18]The district court relied on *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003) to argue that it is appropriate to consider the loss of a business license in the comparable-penalty inquiry. In *Mathias*, unlike here, however, there was evidence that Motel 6, which knowingly rented rooms infested with bedbugs, gained financially from its misconduct and could likely lose its business license. *See id.* at 677 (concluding that Motel 6 profited from the fraud "because by concealing the infestation it was able to keep renting rooms. Refunds were frequent but may have cost less than the cost of closing the hotel for a thorough fumigation."); *Id.* at 678 (noting that under Chicago Municipal Code, "a Chicago hotel that permits unsanitary conditions to exist is subject to revocation of its license, without which it cannot operate").

possible imprisonment," especially when "its references were to [a] broad fraudulent scheme drawn from evidence of out-of-state and dissimilar conduct.538 U.S. at 428. Thus, a comparison of the punitive damage award to the civil penalties that could be imposed for comparable conduct does not support the award and may indicate that $3 million is excessive.

To summarize, an application of the *Gore* guideposts to the facts of this case reveals that (1) Chrysler's misconduct does not constitute a high degree of reprehensibility, (2) the ratio of punitive to compensatory awards is unjustifiably large, and (3) a wide gap exists between the punitive damage award and comparable civil penalties. The fact of Mr. Clark's death does not outweigh all. Therefore, the jury's award of $3 million as punitive damages upon an award of $235,629.13 as compensatory damages is neither reasonable nor proportionate to the wrong committed. Instead, we conclude that a ratio of approximately 2:1 or $471,258.26 in punitive damages would comport with the requirements of due process. Accordingly, we reverse the district court's denial of Chrysler's motion for remittitur and remand this matter with instructions to enter a punitive damage award of $471,258.26, subject to Mrs. Clark's acceptance. Absent Mrs. Clark's acceptance of the remittitur, the district court is instructed to conduct a new trial, limited to determining the proper amount of the punitive damage award. *See Strickland v. Owens Corning*, 142 F.3d 353, 360 (6th Cir. 1998) (explaining that "the policy behind the device of remittitur . . . is that if the plaintiff is willing to accept a lower amount of damages rather than incur the risks and expense of a new trial, and the defendant cannot complain because that lower amount would have been within the jury's power to award, it is a just economy to terminate the suit without a retrial" (quoting *Davis v. Consol. Rail Corp.*, 788 F.2d 1260, 1267 (7th Cir. 1986))).

### C.     A new trial on punitive damages, based on trial error, is unwarranted

Chrysler alternatively argues that *State Farm* requires a new trial in light of improper arguments and vague jury instructions. In its reprehensibility analysis, *State Farm* discussed how overly-broad statements or vague jury instructions may result in excessive awards. *See* 538 U.S. at 418 ("Our concerns [over arbitrary punishments] are heightened when the decisionmaker is presented . . . with evidence that has little bearing as to the amount of punitive damages that should be awarded."). Nothing in *State Farm*, however, mandates a new trial on these grounds. Nonetheless, we briefly explain why a new trial on punitive damages is unwarranted.

#### 1.     Closing arguments

Because plaintiff's closing arguments did not urge the jury to punish Chrysler for its nationwide business activities or for the harm it inflicted on third party individuals, *State Farm* does not require a new trial on these bases.[19]

First, plaintiff's closing arguments did not improperly urge the jury to punish Chrysler for its conduct outside the state of Kentucky. In *State Farm*, the Court explained that "a State [does not] have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction." 538 U.S. at 421. The Court concluded that the plaintiff had framed the case as a chance to punish the defendant's nationwide conduct, citing counsel's statement that "[t]his is a very important case. . . . [I]t transcends the [plaintiffs'] file. It involves a nationwide practice. And you, here, are going to be evaluating and assessing, and

---

[19]Contrary to Clark's assertion, Chrysler did not waive this argument by failing to object to plaintiff's closing arguments at trial. In the Sixth Circuit, if "counsel's closing argument is improper, and if there is a reasonable probability that the verdict of [the] jury has been influenced by such conduct, it should be set aside," even if opposing counsel failed to object. *Strickland*, 142 F.3d at 358 (alteration in original) (quotations and citation omitted). However, "failure to object at trial to closing arguments does raise the degree of prejudice which must be demonstrated in order to get a new trial on appeal." *Id.*

hopefully requiring [the defendant] to stand accountable for what it's doing across the country, which is the purpose of punitive damages." *Id.* at 420–21 (quoting Trial Tr.).

Plaintiff's opening statements in this case are unlike those in *State Farm*. Although plaintiff's counsel told the jury to act as the federal government, when read in context, it is clear that this remark was a response to Chrysler's assertion that because it had complied with federal safety standards, its product was not defective.[20]   And although plaintiff's counsel asked the jury to "send Chrysler a message" that changes are necessary, this comment[21] was appropriately aimed at deterring Chrysler's use of a defective door latch system in the future.   *See State Farm*, 538 U.S. at 416 (explaining that "punitive damages . . . are aimed at deterrence and retribution"); *Gore*, 517 U.S. at 568 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."); *see also McClain v. Metabolife Int'l, Inc.,* 259 F. Supp. 2d 1225, 1230 (N. D. Ala. 2003) ("Although plaintiffs' counsel, as plaintiffs' lawyers do, made the time honored argument 'Send Them A Message,' there was no attempt . . . to punish [the defendant] for what it may have done to [others] beyond the four consumers in this case."), *rev'd on other grounds*, 401 F.3d 1233 (11th Cir. 2005).  Here, plaintiff's opening statements simply did not urge the jury to punish Chrysler for its extraterritorial conduct. *Cf. Sand Hill Energy, Inc. v. Smith*, 142 S.W.3d 153, 157 (Ky. 2004) (concluding that jury was improperly encouraged to punish Ford for its nationwide conduct when presented with evidence of the number of vehicles Ford sold containing the defect at issue, the number of similar incidents, and the number of individuals who were killed by such incidents).

Second, plaintiff's closing arguments did not encourage the jury to punish Chrysler for inflicting harm on third party individuals.  In *State Farm*, the Court explained that "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." 538 U.S. at 422.  Contrary to Chrysler's assertion, plaintiff's counsel did not violate this rule by referencing Mr. Goode's accident.[22]   Unlike the "tangential" evidence that was "introduced at length" in *State Farm*, *see id.* at 423–24, Mr. Goode's accident was "substantially similar" to that of Mr. Clark.[23]   Moreover, these remarks emphasize Chrysler's failure

---

[20]Specifically, counsel stated that "the only test Chrysler Corporation has done that has anything to do with the door latch and the door latch coming open is what's required by the federal government. . . . They are saying, we are going to not do anything unless Uncle Sam makes us. . . . Well, today . . . you all are the federal government in this case." J.A. at 394.

[21]In particular, counsel stated that "[t]he message to send Chrysler, I think they need to get, somebody needs to get their attention and say you don't do this," J.A. at 406; "the message that should be sent is do better," J.A. at 407; "the evidence warrants punitive damages.  And it should be enough that somebody at Chrysler Corporation up in Detroit or wherever . . . knows about this and somebody gets enough that somebody asks, wait a minute, why did that jury in London, Kentucky, why did they award this amount of punitive damages?  What was that case about?" J.A. at 407–08.

[22]There are three comments at issue:  First, counsel told the jury that unlike Charles Clark, Mr.  Goode was wearing his seatbelt and "[s]till got ejected" from a Chrysler vehicle. J.A. at 391.  Second, counsel stated that "Charley Clark tested [the truck] for Chrysler.  Perry good [sic] tested it for Chrysler.  Chrysler didn't test it." J.A. at 400.  Third, counsel told the jury that "punitive damages are to send a message. . . . The message to send Chrysler, I think they need to get, somebody needs to get their attention and say you don't do this.  You test [the trucks] before you sell them.  You don't wait until somebody gets killed and hire [an expert] to run a test that has nothing to do with the facts of this case. . . . You test them before Perry Goode gets thrown out and laid up for two years.  You test them before Charles Clark gets killed." J.A. at 405–06.

[23]The trial judge explained, "I found substantial similarity in that the striking vehicle struck with the right front fender; the struck vehicle was hit in the left front fender; . . . the B pillar on the club Ram pickup is identical, according to . . . interrogatory responses . . . to the 1992 B pillar on the . . . club Ram pickup that Mr. Clark was driving." J.A. at 251–52.

to test its trucks, a ground upon which liability was premised. [*See* Interrogs. to Jury; Verdict Form, Interrog. 2, J.A. at 59.]

Accordingly, plaintiff's closing arguments do not necessitate a new trial.

### 2.        Jury instruction

Although *State Farm* emphasized that "[v]ague instructions, or those that merely inform the jury to avoid 'passion or prejudice,' do little to aid the decisionmaker in its task of assigning appropriate weight to evidence that is relevant and evidence that is tangential or only inflammatory," 538 U.S. at 418 (citation omitted), the Court had expressed concern previously over imprecise jury instructions on punitive damages. *See Gore*, 517 U.S. at 588 (Breyer, J., concurring) ("Legal standards need not be precise . . . [b]ut they must offer some kind of constraint upon a jury or court's discretion, and thus protection against purely arbitrary behavior. The standards the . . . courts applied here are vague and open ended to the point where they risk arbitrary results."); *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 475 (1993) (O'Connor, J., dissenting) (noting that "it cannot be denied that the lack of clear guidance heightens the risk that arbitrariness, passion, or bias will replace dispassionate deliberation as the basis for the jury's verdict"); *Haslip*, 499 U.S. at 18 (explaining that "general concerns of . . . adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus"). Therefore, in accordance with *State Farm*, we considered the adequacy of the jury instruction in our reprehensibility analysis above. *See supra* note 12. *State Farm* does not require us, however, to order a new trial based on Chrysler's previously waived or disposed-of arguments in this respect.

First, because Chrysler agreed to the language of the jury instruction, the court's failure to include the guideposts set out in title 36, section 411.186(2) of the Kentucky Code does not necessitate a new trial.[24] Clark provided Chrysler with two different punitive damage instructions. One contained the factors specified in section 411.186, and the other included a common law "bare-bones" instruction. [J.A. at 93–94.] Chrysler agreed to the latter. [J.A. at 52.] Thus, Chrysler is not entitled to a new trial on this ground.[25]

Second, we previously rejected Chrysler's argument that the jury should have been instructed that Chrysler's compliance with the federal door latch standard created a presumption that the truck was not even defective. *See Clark*, 310 F.3d at 475–76. Given *State Farm's* narrow focus on the extent of punitive damages, it is unnecessary for us to reconsider our earlier decision or to order a new trial on this basis.

Third, although *State Farm* stated that "[a] jury must be instructed . . . that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred," 538 U.S. at 422, the Court was merely reiterating a principle previously enunciated in *Gore*. *See* 517 U.S. at 572–73 (noting that a State "does not have the power . . . to punish [a defendant] for conduct that was lawful where it occurred and that had no impact on [the State] or its residents"). Therefore, Chrysler could have raised this argument earlier. Moreover, there

---

[24]The five factors specified in the statute are (1) the likelihood that serious harm would arise from the defendant's misconduct; (2) the degree of the defendant's awareness that serious harm would occur; (3) the profitability of this misconduct to the defendant; (4) the duration of the misconduct, and any concealment of it by the defendant; and (5) any actions taken by the defendant to remedy the misconduct once the defendant became aware of the misconduct. Ky. Rev. Stat. Ann. § 411.186(2).

[25]Moreover, Chrysler did not challenge the instruction on this basis on its first appeal, *see Clark*, 310 F.3d 461; and in its petition for writ of certiorari, it argued this point only with respect to reprehensibility, *see* Pet. for Writ of Cert., No. 02-1748, 2003 WL 22428164, at *22, n.9.

is no indication that Clark even introduced evidence of Chrysler's conduct outside of Kentucky. Thus, the absence of this instruction does not necessitate a new trial.

In sum, because Chrysler is not entitled to a new trial on the basis of improper closing arguments or inadequate jury instructions, we affirm the district court's denial of Chrysler's motion for a new trial.

## III.  CONCLUSION

For the reasons set forth above, the district court's order denying Chrysler's motion for remittitur is **REVERSED** and this matter is **REMANDED** to the district court with instructions to enter an order of remittitur as to punitive damages in the amount of $471,258.26.  The district court's order denying Chrysler's motion for judgment as a matter of law is **AFFIRMED**.  The district court's order denying Chrysler's motion for a new trial is **AFFIRMED**.

---

### CONCURRENCE IN PART

---

KENNEDY, Circuit Judge, concurring in part and concurring in the judgment.  I concur in the bulk of Judge Restani's opinion.  I also concur in the judgment.  I write separately to express my views on certain aspects of this appeal.

A.      Formed v. Sheet Metal B-Pillar

I do not agree that the evidence on the type of metal used in the B-Pillar supports a finding of punitive damages in this case. There is no testimony in the record that supports the view that the B-Pillar is made of sheet metal or "formed sheet metal."  The only testimony in the record on the B-Pillar's construction comes from Billy Peterson. After testifying that the pillar is made of formed metal, he testified as follows:

> Q.  I just want to make sure that's clear.  That's not unformed.  Unformed is sheet metal that you can wave like this because it hasn't been stamped yet, right?
>
> A.  Unformed means it's a straight piece of metal.
>
> Q.  And straight metal is substantially weaker than once you put it in a form; correct?
>
> A.  Well, when you say substantially, sir, it depends on what kind of forming and how much you do.
>
> Q.  All right.  Let me ask this question.  If it's formed, is it stronger than when it's not formed?
>
> A.  Yes, sir.

J.A. at 324-25. The B-Pillar is made of formed metal. My review of the record shows no evidence as to how much stronger formed metal is than sheet metal, nor did Plaintiff establish the difference in performance in an accident between sheet metal and formed metal.  In my view, this absence of proof means that the only facts that support the award in this case is the fact that Chrysler did not use a boxed B-Pillar design. While Chrysler may well be negligent for its failure to use a boxed B-Pillar design, I have some difficulty in affirming a punitive damage award on that basis alone, as I am not convinced that Chrysler had the requisite knowledge of its negligence.  In light of our previous panel's decision affirming punitive damages, however, and the unclear nature of the Supreme Court's remand, I am willing to concur in Judge Restani's waiver holding and address only the amount of the punitive damages, not whether punitive damages are warranted at all.

B.      Level of Punitive Damages

After recognizing that other courts have reduced punitive damages to a one-to-one ratio because the compensatory damages in those cases were substantial, Judge Restani's opinion concludes that the halved damage award here of $235,629.13 is "not very substantial."  I cannot agree with this conclusion.  The Supreme Court has instructed that:

> because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages."  *Ibid.;*  see also *ibid.* (positing that a higher ratio *might* be

necessary where "the injury is hard to detect or the monetary value of noneconomic
harm might have been difficult to determine"). The converse is also true, however.
When compensatory damages are substantial, then a lesser ratio, perhaps only equal
to compensatory damages, can reach the outermost limit of the due process guarantee.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 523 U.S. 408, 425 (2003) (citing *BMW of North
America, Inc. v. Gore*, 517 U.S. 559, 582 (1996)).

In evaluating whether a damage award is substantial under a comparative fault regime, I
believe that we should use the total compensatory award in evaluating whether the award is
substantial. Using an award apportioned by the fault of the parties could have the effect of finding
an award that is substantial as a whole, insubstantial when it is apportioned. For example, assume we
have a case with three tortfeasors, each one quarter at fault. Assume that we have a victim, who is
also one quarter at fault. The victim is awarded $1 million dollars in damages (an award the Supreme
Court has found to be substantial, *see id.* at 426). If the award were looked at after apportionment of
fault (i.e. each tortfeasor's $250,000 portion of the total award), it is possible that no single
tortfeasor's portion of the award would be substantial, indeed under Judge Restani's opinion, those
portioned awards would likely not be found to be substantial. This result is incongruous because the
victim in my hypothetical would still be receiving a substantial damage award in total (over $750,000
of the original $1 million award), even though each tortfeasor's portion of the award might not be
substantial. Thus, I believe that this court should use the full $471,258.26 award in evaluating
whether the compensatory damages are substantial. In light of the case law cited by Judge Restani,
which found awards as low as $600,000 to be substantial, I cannot concur in her conclusion that the
award in this case is "not very substantial" as I find no discernible difference between a $600,000
award and a $471,258.26 award.

I would reach this conclusion even if the halved compensatory damage award were used, as
I believe that $235,629.13 is also a substantial compensatory award. I would reach this conclusion
because I do not believe that an award of $235,629.13 of compensatory damages falls into either of
the Supreme Court's categories, in that it is not a "small amount of economic damages," nor is it a
case where "the injury is hard to detect or the monetary value of noneconomic harm . . . difficult to
determine." *State Farm Mut. Auto. Ins. Co.,* 523 U.S. at 425 (citing *Gore,* 517 U.S. at 582). Even
today, $235,629.13 could not be described as a "small amount," and because in this case, the injury
was obvious and the monetary value of the harm is something that courts and juries routinely
calculate, the monetary value cannot be described as "difficult to determine." *Id.*

I can, however, despite this disagreement, concur in the judgment and the result reached by
Judge Restani because I also believe that the punitive damages award should not be reduced by the
comparative fault of Mr. Clark. The dual goals of punitive damages are to punish a tortfeasor for
wrongdoing (retribution) and to deter future similar conduct. *Cooper Industries, Inc. v. Leatherman
Tool Group, Inc.*, 532 U.S. 424, 432 (2001). In this case, punitive damages punish Chrysler for a
design defect in its vehicles that leads to what the parties refer to as B-Pillar twist-out. In some cases,
including the instant case, B-Pillar twist-out can result in a door opening during an accident.

The previous panel found that Chrysler was aware that B-Pillar twist-outs can occur during
accidents. Chrysler was also aware that doors that open during accidents lead to an increased risk
of a passenger being ejected during an accident. Finally, Chrysler was aware that if a passenger is
ejected during an accident, they suffer a significant increase in their risk of dying during the accident.
Thus, Chrysler was aware that its unsafe design increased the risk of death to passengers in its
vehicles if those vehicles are involved in accidents. Punitive damages in this case, thus, should
punish Chrysler for the range of possible injuries, including death, that could result from its unsafe
design. Punishing Chrysler a lesser amount based on its level of comparative fault does not
appropriately punish Chrysler for the risk that results from its unsafe design, nor does it serve the goal

of deterring similar future conduct by Chrysler. Its punishment is for the design defect. The risk from the design defect was the same whether the impact was on the driver's side (with an at fault driver recovering a reduced amount due to his or her comparative negligence) or on the passenger's side (with a passenger, not at fault, recovering a full award).

I, therefore, would not halve the punitive damages awarded to Chrysler. Consequently, I come to the same conclusion as Judge Restani that $471,258.26 is the maximum constitutional award in this case based on a one-to-one ratio of compensatory to punitive damages, and I join in her judgment.

---
### CONCURRING IN PART, DISSENTING IN PART
---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I join the majority's waiver and new-trial holdings. I write separately, however, because I believe that the punitive damages award was not excessive under the Due Process Clause and therefore should be sustained in full.

"Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 19 (1991). "In our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Gore*, 517 U.S. at 568. "While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 416 (citations omitted).

Due-process review of punitive damages for gross excessiveness is governed by three "guideposts" announced in *Gore*, 517 U.S. at 574-75. The Supreme Court recently summarized these factors: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 575).

## A. Reprehensibility

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419 (alteration in original) (quoting *Gore*, 517 U.S. at 575). In making the reprehensibility determination, the Court has instructed us to consider whether: "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* (citing *Gore*, 517 U.S. at 576-77).

### 1. Physical vs. Economic Harm

I agree that the type of harm — physical rather than merely economic — weighs strongly in favor of finding Chrysler's conduct reprehensible. Moreover, the harm was complete in degree, i.e., death. As this court and others have recognized, a defendant's conduct is particularly reprehensible when it results in someone's death. *E.g.*, *Gregory v. Shelby County*, 220 F.3d 433, 445 (6th Cir. 2000); *Estate of Moreland v. Dieter*, 395 F.3d 747, 757 (7th Cir.), *cert. denied*, — U.S. —, 125 S. Ct. 2915 (2005); *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005); *Stogsdill v. Healthmark Partners, L.L.C.*, 377 F.3d 827, 832 (8th Cir. 2004); *Union Pac. R.R. Co. v. Barber*, 149 S.W.3d 325, 348 (Ark.), *cert. denied*, — U.S. —, 125 S. Ct. 320 (2004); *Dardinger v. Anthem Blue Cross & Blue Shield*, 781 N.E.2d 121, 140 (Ohio 2002); *Cherokee Elec. Coop. v. Cochran*, 706 So. 2d 1188, 1194 (Ala. 1997).

## 2.  Indifference to or Reckless Disregard of the Safety of Others

Under the reprehensibility sub-factor of indifference to or reckless disregard of the safety of others, the district court found the following facts on the way to concluding that "[Chrysler's] conduct evinces a reckless disregard for the safety of others since it exposed its customers to an untested product":

> [Chrysler] utilized a thin piece of sheet metal as a B-pillar at the door latch striker. [Clark] presented evidence that [Chrysler] knew that the piece of sheet metal was weak and that its strength had been untested. *The sheet metal type of B-pillar had been removed from the modern state of the art and state of the industry for over 40 years. Every other modern motor vehicle on the market, including pickup trucks, employed a boxed B-pillar.* General Motors had developed a system to test its door la[t]ches to insure they would withstand B-pillar twisting, which it shared with [Chrysler].  *[Chrysler], however, failed to implement this test, even though it knew that a driver's risk of death was greatly increased if ejected from a vehicle.* Moreover, [Chrysler] knew that B-pillar twist-out was a failure mode known to the automotive industry and in fact the federal government was investigating the B-pillar twist-out problem.  Despite this knowledge, [Chrysler] continued to utilize a thin piece of sheet metal in the place of a much stronger boxed B-pillar. . . . Additionally, [Chrysler] had received information which should have led it to question the safety of this product.

Joint Appendix ("J.A.") at 34-35 (Dist. Ct. Op. & Order at 4-5) (emphases added).  The lead opinion also recognizes much evidence that supports the district court's finding that Chrysler's conduct showed indifference to or reckless disregard of others' safety.  Lead Op. at 6.

Despite this evidence, the lead opinion concludes that Chrysler's conduct did not reflect indifference to or reckless disregard of the safety of others because "[i] there is no evidence that a boxed-in B-pillar would have prevented the harm suffered by . . . Clark, and . . . [ii] there is a good-faith dispute over whether B-pillar testing is necessary."  *Id.* at 7.  In light of the unusual circumstance in which the district court judge who presided at trial was not the judge who wrote the opinion we review today, I accept for present purposes giving less deference to the district court's factual findings.  Nevertheless, I cannot agree with the two premises undergirding the lead opinion's conclusion.

In support of the first premise that "there is no evidence that a boxed-in B-pillar would have prevented the harm suffered by . . . Clark," the lead opinion argues that "[a]lthough Clark's experts testified as to their belief that the un-boxed B-pillar was weak, they did not conduct any tests to see whether another B-pillar would have prevented a door latch from opening under similar circumstances."  *Id.*  One of Clark's experts testified that a "box[ed]" or otherwise "properly-constructed" B-pillar would have prevented the twist out and concomitant door-opening. J.A. at 292, 309 (Trial Tr. at 148, 165) (Peterson Test.).  In a similar vein, another expert testified that a "state-of-the-art latch" would have prevented the ejection by not allowing the door to open in the accident. J.A. at 140, 145 (Trial Tr. at 119, 124) (Gilberg Test.).  The testimony of these two experts is more than enough evidence that another B-pillar and/or latch would have prevented the door from opening in similar circumstances.

To the extent that the lead opinion ignores this evidence simply because the experts did not conduct tests, it acts beyond the scope of this appeal.  In its prior appeal, Chrysler attacked Clark's experts for not conducting tests specific to this suit.  We resolved the issue in Clark's favor in our prior opinion, *Clark v. Chrysler Corp.*, 310 F.3d 461, 466-72 (6th Cir. 2002), *vacated on other grounds*, 540 U.S. 801 (2003), and the Supreme Court remanded the case to us "for further

consideration in light of [*State Farm*]." *Chrysler Corp. v. Clark*, 540 U.S. 801, 801 (2003). To reject the experts' opinions here essentially revisits the evidentiary issue and therefore exceeds the scope of the Court's remand, a move that is even more questionable in light of our reinstatement of the evidentiary holding of our earlier opinion.

In support of the second premise that "there is a good-faith dispute over whether B-pillar testing is necessary," the lead opinion argues that "because the [twist-out] test was neither required by the government nor used by other manufacturers, we cannot conclude that Chrysler's failure to adopt the test indicates a level of indifference to or reckless disregard for the safety of others sufficient to weigh in favor of reprehensibility." Lead Op. at 7-8. Excusing Chrysler's failure to adopt the test because of the lack of a government requirement is questionable at best when 49 U.S.C. § 30103(e) expressly provides that "[c]ompliance with a motor vehicle safety standard . . . does not exempt a person from liability at common law," while appealing to the other manufacturers' failure to use the test ignores the fact that every other manufacturer used the safer boxed B-pillar. Why would these companies conduct tests on the safety of an obsolete part that they did not use? More to the point, why equate these manufacturers' sensible reluctance not to test a part they did not use with Chrysler's failure to test a part that it continued to use?[1]

The ample evidence discussed in the district court opinion, the lead opinion, and this separate opinion reflects Chrysler's indifference to or reckless disregard for the safety of others. Therefore, this sub-factor weighs in favor of finding Chrysler's conduct reprehensible.

### 3. Financial Vulnerability

I agree that the district court erred by holding that Chrysler's wealth and Clark's purchase of one of Chrysler's vehicles automatically put Clark in a financially vulnerable position. Clark has not put forth other evidence of financial vulnerability, so this reprehensibility sub-factor does not weigh in Clark's favor.

The lead opinion goes too far, however, in disapproving the consideration of a defendant's financial condition when reviewing a punitive damages award.[2] The Supreme Court has never forbidden such consideration. In *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991), the Court approved instructions that permitted the jury to consider, among other factors, "the financial position of the defendant," holding that they "impose[d] a sufficiently definite and meaningful constraint on the discretion of [the jury] in awarding punitive damages." *Id.* at 21-22 (internal quotation marks omitted). In *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443 (1993) (plurality opinion), the plurality cited *Haslip* approvingly in rejecting the defendant's contention that the jury impermissibly considered its "impressive net worth," noting that it was "well-settled law" to allow consideration of this factor. *Id.* at 462 n.28. In *Gore*, the Court observed that "[t]he fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business," 517 U.S. at 585, but of course this statement does not purport to address — let alone disturb — the "well-settled law" that it is proper to consider a defendant's wealth. Finally, in *State Farm*, the Court noted that "[t]he

---

[1] It is clear, then, that there is no true "good-faith dispute" over the necessity of B-pillar testing. Therefore, the cases cited in the lead opinion for the proposition that a good-faith dispute precludes a finding of indifference to or reckless disregard of others' safety, *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702 (5th Cir. 1997); *Satcher v. Honda Motor Co.*, 52 F.3d 1311 (5th Cir. 1995), *cert. denied*, 516 U.S. 1045 (1996), are inapposite.

[2] The Supreme Court has not discussed consideration of the defendant's financial condition in the context of the reprehensibility guidepost. *See State Farm*, 538 U.S. at 427-28 (discussing the defendant's assets under the ratio guidepost); *Gore*, 517 U.S. at 585 (discussing the defendant's status as "a large corporation" in the conclusion). I discuss the issue here only because the lead opinion discusses it under the first guidepost and my responses will be clearest if I maintain a parallel organization.

wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award," 538 U.S. at 427, but this statement is best understood in light of a passage it cites: "[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy . . . . *That does not make its use unlawful or inappropriate*; it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct." *Gore*, 517 U.S. at 591 (Breyer, J., concurring) (emphasis added) (alterations in original), *cited in State Farm*, 538 U.S. at 427-28.

We recently summarized why consideration of the defendant's financial resources is consistent with the purposes underlying punitive damages:

> "Since a fixed dollar award will punish a poor person more than a wealthy one, one can understand the relevance of [the defendant's financial position] to the State's interest in retribution . . . ." The defendant's financial position is equally relevant to the State's interest in deterrence, which is also a valid purpose of punitive damages.

*Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 647 (6th Cir. 2005) (quoting *Gore*, 517 U.S. at 591 (Breyer, J., concurring)) (alterations in original) (citations omitted). Moreover, if a defendant's financial condition were not considered, defendants with superior resources (and correspondingly more aggressive defenses) could over-deter potential plaintiffs from bringing suit. *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (Posner, J.). In light of (i) the Supreme Court's approval of considering the defendant's resources and (ii) the logical link between the defendant's financial condition and punitive damages, it is not surprising that we have taken the defendant's finances into account when reviewing punitive awards for excessiveness. *Romanski*, 428 F.3d at 647-48, 649-50; *see also Mathias*, 347 F.3d at 677.

#### 4. Repeated Actions vs. Isolated Incident

The lead opinion concludes that "there is no evidence that Chrysler repeatedly engaged in misconduct while knowing or suspecting that it was unlawful." Lead Op. at 8. This conclusion appears to rely principally on two premises. The first is that "there is no evidence that Chrysler knew that its use of the un-boxed B-pillar could cause . . . Clark's injury." *Id.* at 9. As discussed in the indifference/reckless disregard section above, there is ample evidence — including much acknowledged in the lead opinion — that Chrysler knew of the dangers of B-pillar twist-out.

The second premise is that there is a lack of "evidence of earlier, similar accidents that might have alerted Chrysler to the problem." *Id.* The failure to point to such accidents, however, does not automatically render this reprehensibility sub-factor in Chrysler's favor. In *Gore*, where the complained-of conduct was the defendant automobile distributor's failure to disclose when its new cars had been repaired for minor predelivery damage, 517 U.S. at 562, the plaintiff argued that the defendant should be treated as a recidivist because it "*should have anticipated* that its failure to disclose [such] repair work could expose it to liability for fraud," *id.* at 577 (emphasis added). The Court rejected this argument, using the following logic. (1) "[A]ctionable fraud requires a *material* misrepresentation or omission." *Id.* at 579. (2) In deciding whether or not to disclose the repairs at issue, the defendant "reasonably rel[ied] on state disclosure statutes for guidance" as to whether the repairs it did not disclose were too minor to be material. *Id.* (3) These disclosure statutes "could [be] reasonably interpret[ed] . . . as establishing safe harbors" for the nondisclosure of minor repairs. *Id.* at 577-78. (4) Therefore, the defendant reasonably did not anticipate that its conduct would give rise to liability for fraud.

Notably, the *Gore* Court did *not* reject per se the plaintiff's "anticipated liability" theory of finding repeated actions. Instead, the Court rejected it on the facts because the defendant had reasonably relied on statutes that could reasonably be interpreted to provide a safe harbor for its

conduct. Chrysler can make no such claim here, because 49 U.S.C. § 30103(e) expressly provides that "[c]ompliance with a motor vehicle safety standard . . . does not exempt a person from liability at common law."

In light of its awareness of the dangers of B-pillar twist-out and its knowledge that there were no statutory "safe harbors" for its conduct, Chrysler should have anticipated that its conduct could expose it to liability and punitive damages. *Gore* implies that such a conclusion would make the defendant a recidivist for purposes of the repeated-action sub-factor; therefore, it weighs in Clark's favor.

### 5. Intentional Malice, Trickery, or Deceit vs. Mere Accident

I agree that because (i) Chrysler did not act with intentional malice, trickery, or deceit and (ii) Clark's death was not the result of a mere accident, this reprehensibility sub-factor is neutral, favoring neither party.

### 6. Summary

The *State Farm* Court cautioned that "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." 538 U.S. at 419. Here, three factors (the harm was physical; Chrysler showed indifference to or reckless disregard of the safety of others; Chrysler's conduct involved repeated conduct) weigh in favor of Clark; one factor (Clark was not financially vulnerable) weighs in favor of Chrysler; and one factor (Chrysler's conduct involved neither intentional malice, trickery, or deceit nor mere accident) is neutral. This balance surpasses the sufficiency standard of only one factor in favor of the plaintiff, and it is of course enough to avoid the automatically "suspect" condition when all five factors are absent. In light of the fact that three out of four non-neutral factors favor the plaintiff — especially when those three are the plaintiff's physical injury, the defendant's indifference toward or reckless disregard of the safety of others, and the defendant's repeated conduct — Chrysler's conduct was reprehensible.

## B. Ratio

Judge Restani concludes that a ratio between punitive and compensatory damages of 13:1[3] is "not justified" but a ratio of 2:1 "is appropriate." Lead Op. at 10. She reaches this conclusion by presuming that the ratio should be less than 4:1 but more than 1:1, but fails persuasively to justify the choice of these two ratios as bookends within which the instant ratio must fall.

Judge Restani begins by presuming that the punitive-to-compensatory ratio should be less than or equal to 4:1. This ratio is one that the Supreme Court supposedly set as a ceiling in *Haslip*, *Gore*, and *State Farm*. Upon closer inspection, however, it is clear that the Court has never actually said that the 4:1 ratio is a constitutional ceiling. A review of the cases shows that the Court has only intimated that a 4:1 ratio *might be* close to the line. In *Haslip*, the Court assessed a punitive damages

---

[3] Judge Restani calculated the 13:1 (12.73 rounded) ratio after apportioning for comparative fault, meaning that she used half the compensatory damages in the ratio's denominator. Judge Kennedy implicitly analyzes a different ratio — 6.4:1 (6.37:1 rounded) — by using the entire compensatory award in the ratio's denominator. Judge Kennedy then reaches "the same conclusion as Judge Restani that $471,258.26 is the maximum constitutional award in this case based on a one-to-one ratio of compensatory to punitive damages." J. Kennedy Op. at 18. As this difference in approach suggests, the issue of the proper *Gore* ratio denominator is a difficult one. Because I conclude that even the higher ratio is not excessive in this case, a choice of denominator is unnecessary. Instead, I simply accept the 13:1 ratio for current purposes, *assuming* that half the compensatory damages is the appropriate figure to use in the denominator. Thus, the panel leaves the resolution of the denominator issue for an appropriate future case.

award of "more than 4 times" the compensatory damages award.[4]   499 U.S. at 23.   The Court observed that although this ratio "*may be* close to the line," ultimately it "[did] not cross the line into the area of constitutional impropriety." *Id.* at 23-24 (emphasis added).  The *Gore* Court cited *Haslip* for the proposition that a ratio of more than 4:1 "*might be* 'close to the line.'"   517 U.S. at 581 (emphasis added).  But the Court had no occasion to give greater meaning to the 4:1 ratio, because the ratio in *Gore* was "a breathtaking 500 to 1."  *Id.* at 583.  Finally, in *State Farm* the Court noted that it had said in *Haslip* and *Gore* that the 4:1 ratio "*might be* close to the line."  538 U.S. at 425 (emphasis added).  But once again the Court did not give any special weight to the 4:1 ratio, because the ratio before it was 145:1.  In other words, the Court has never explicitly said that a 4:1 ratio actually *is* close to the constitutional line, just that it *might be*.

One might object that this distinction between *is* and *might* is purely a semantic one, and that the Court really has given the 4:1 ratio a special place in the due process excessiveness analysis. Such a position does not withstand scrutiny, however, in light of the Court's decision in *TXO*. There, the punitive damages award was "over 526 times as large" as the compensatory damages award.[5] *TXO*, 509 U.S. at 459.  The plurality explained that the relevant measure for comparison was the potential damage, *id.* at 462, which lowered the ratio to somewhere between 1.2:1 and 10:1.[6]  The Court has since characterized the ratio in *TXO* as "not more than 10 to 1."  *Gore*, 517 U.S. at 581; *see also State Farm*, 538 U.S. at 430 n.1 (Ginsburg, J., dissenting) (noting the *Gore* Court's characterization of the *TXO* ratio); *TXO*, 509 U.S. at 472 (Scalia, J., dissenting) (describing the Court's decision as upholding a "10-to-1 ratio between punitive damages and the potential harm" (emphasis deleted)).  When one considers that the Court in *TXO* upheld a punitive award that, even when charitably interpreted, featured a 10:1 ratio,[7] one cannot seriously conclude that the Court really has designated the 4:1 ratio as close to the constitutional line or as a presumptive ceiling.[8]   *See Mathias*, 347 F.3d at 676 ("The Supreme Court did not, however, lay down a 4-to-1 or single-digit-ratio rule — it said merely that 'there is a presumption against an award that has a 145-to-1 ratio,' — and it would be unreasonable to do so." (internal citation removed) (quoting *State Farm*, 538 U.S. at 426)).

Having decided that the instant ratio should be less than 4:1, Judge Restani then makes a subtle rhetorical move, devoting the rest of her analysis to explaining why the ratio should be greater than 1:1.  Yet just as she did not demonstrate why 4:1 should be the ceiling, Judge Restani does not persuasively show why the floor should be so low.  She begins by relying on *State Farm*, stating that the Court "concluded that 'in light of the substantial compensatory damages awarded (a portion of

---

[4]The precise figures were $840,000 punitive damages and $200,000 compensatory damages, *Haslip*, 499 U.S. at 7 n.2, for a ratio of 4.2:1.

[5]The precise figures were $10 million punitive damages and $19,000 compensatory damages, *TXO*, 509 U.S. at 451, for a ratio of 526.3:1.

[6]The plurality cited figures from $1 million to $8.3 million as possible values of the potential harm to the plaintiffs, *TXO*, 509 U.S. at 462, which yield ratios of 10:1 and 1.2:1, respectively.

[7]The Court has also upheld a ratio of punitive to compensatory damages of over 100:1, albeit under the Eighth Amendment's Excessive Fines Clause.  *See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 262 (1989) ($6 million punitive award and $51,146 compensatory award, for a ratio of 117.3:1).

[8]Perhaps instead Judge Restani believes the 13:1 ratio is too high because it exceeds double digits.  Yet just as *Haslip*, *Gore*, and *State Farm* did not establish a 4:1 ceiling, *State Farm* did not establish a 10:1 ceiling, presumptive or otherwise.  Instead, the Court advised that "few awards exceeding a single-digit ratio between punitive and compensatory damages, *to a significant degree*, will satisfy due process."  *State Farm*, 538 U.S. at 425 (emphasis added). Although 13:1 is a double-digit ratio, it surely does not exceed single digits "to a significant degree."  And, of course, a ratio of 6.4:1 does not exceed single digits at all.

which contained a punitive element), [. . .] a punitive damages award at or near the amount of compensatory damages' was justified." Lead Op. at 11 (quoting *State Farm*, 538 U.S. at 429). Two aspects of this claim are worth exploring at greater length.

First, this characterization of *State Farm* overstates what the Court actually said. The Court held that the $145 million punitive damages award was excessive but never reached the issue of what size award would be justified: the Court remarked that the facts of the case "*likely* would justify a punitive damages award at or near the amount of compensatory damages" but left "[t]he proper calculation of punitive damages . . . [to] be resolved, in the first instance, by the Utah courts." *State Farm*, 538 U.S. at 429 (emphasis added). Indeed, on remand the state supreme court reduced the award from $145 million to about $9 million, yielding a 9:1 ratio. *Campbell v. State Farm Mut. Auto. Ins. Co.*, 98 P.3d 409, 420 (Utah), *cert. denied*, — U.S. —, 125 S. Ct. 114 (2004). The Supreme Court denied State Farm's subsequent petition for certiorari. *State Farm Mut. Auto. Ins. Co. v. Campbell*, — U.S. —, 125 S. Ct. 114 (2004).

Second, even if the Court was in fact strongly hinting to the Utah Supreme Court that it should remit the punitive award to a 1:1 ratio, it did so "in light of the substantial compensatory damages awarded (*a portion of which contained a punitive element*)." *State Farm*, 538 U.S. at 429 (emphasis added). The Court's parenthetical phrase is no throwaway line — it refers to the discussion of an issue that is highly relevant to the instant case:

> The compensatory award in this case was substantial; the Campbells were awarded $1 million [in compensatory damages] for a year and a half of *emotional distress*. This was complete compensation. . . . The compensatory damages for the injury suffered here, moreover, likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the *outrage and humiliation* the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element. See Restatement (Second) of Torts § 908, Comment c, p. 466 (1977) ("In many cases in which compensatory damages include an amount for *emotional distress*, such as *humiliation or indignation* aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both").

*Id.* at 426 (emphases, including those in the parenthetical quotation of the Restatement, added). In the instant case, the jury awarded Clark $250,000 for the destruction of his earning power; $100,000 for his mental and physical suffering; $100,000 for his wife's loss of his aid, assistance, services, society, and companionship; $12,778.26 for medical expenses; and $8,480 for burial expenses. J.A. at 424 (Jury Verdict). In other words, the award was not directed at harms — emotional distress caused by humiliation, outrage, or indignation — that the Supreme Court identified as the punitive element of compensatory damages. Because there is thus no concern that "[t]he compensatory damages for the injury suffered here . . . likely were based on a component which was duplicated in the punitive award," *State Farm*, 538 U.S. at 426, there is no reason to hew blindly to the 1:1 ratio that the *State Farm* Court supposedly endorsed.

Judge Restani also attempts to justify the choice of a 1:1 floor by citing two Eighth Circuit cases that reduced punitive awards to a 1:1 ratio. Yet these cases are also readily distinguishable. In *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594 (8th Cir. 2005), the court remitted the punitive award of $15 million to $5 million where the plaintiff had received a compensatory award of over $4 million on claims that the defendant's design defect had resulted in his wife's illness and wrongful death. *Id.* at 598, 603. As Judge Restani concedes, however, the compensatory award in the instant case — approximately $471,000 or $236,000, depending on one's choice of the appropriate baseline — is not as substantial as the compensatory award in *Boerner*. Indeed, the

compensatory award in *Boerner* was 8.54 or 17.08 times larger than the compensatory award here. This disparity between the compensatory awards in *Boerner* and in the instant case would seem to militate *against* using the 1:1 ratio as a baseline. In *Williams v. ConAgra Poultry Co.*, 378 F.3d 790 (8th Cir. 2004), the court remitted the punitive award of over $6 million to $600,000 where the plaintiff had received a compensatory award of $600,000 on a hostile work environment claim under 42 U.S.C. § 1981. *Id.* at 793, 799. Although the misconduct of those who commit workplace harassment and the harms endured by their victims should not be minimized, it cannot seriously be questioned that the harm of death (and the misconduct causing it) is different in kind. No further comment is necessary to see that the use of the ratio in a harassment case to set the ratio in a wrongful death case is misguided.

The very approach of setting the 1:1 floor is at least as problematic as the individual distinctions between the instant case and *State Farm*, *Boerner*, and *Williams*. A court cannot simply set floors or ceilings in the case before it by borrowing ratios from other cases. To do so ignores both the Supreme Court's "consistent[] reject[ion] [of] the notion that the constitutional line is marked by a simple mathematical formula," *Gore*, 517 U.S. at 582, and its instruction that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff," *State Farm*, 538 U.S. at 425.

Having rejected the presumptive ceiling and floor as flawed both in approach and in the specific ratios chosen, I see no independent justification for reducing the ratio from 13:1. Indeed, Judge Restani makes several points (in the discussion of why the ratio should be greater than 1:1) that actually favor leaving the full punitive award undisturbed. First, "the ratio here is not comparable to other 'breathtaking' awards." Lead Op. at 10. Second, the compensatory award is not "overly" or "particularly" large and in fact could be fairly described as "not very substantial."[9] *Id.* at 10, 11. Third, Clark endured a "severe noneconomic harm." *Id.* at 10.

Whether the injury is physical is, of course, part of the reprehensibility analysis (*Gore*'s first prong). But as Judge Restani seems to recognize, it also deserves special consideration under the ratio guidepost. Over the course of its punitive damages jurisprudence, the Court has struck down ratios of 500:1 (*Gore*) and 145:1 (*State Farm*), while upholding ratios of 10:1 (*TXO*) and 4:1 (*Haslip*). In none of these cases did the plaintiff suffer physical injury, let alone death. Yet the Court has suggested that physical harm would justify higher ratios. *See State Farm*, 538 U.S. at 426 (holding the 145:1 ratio too high while noting that the economic injury in that case "arose . . . not from some physical assault or trauma; there were no physical injuries"). To strike down a wrongful-death punitive award with a ratio barely higher than those that the Court has upheld in economic injury cases would ignore the Court's none-too-subtle suggestion.

Finally, the following statement by the *Gore* Court is instructive: "In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis [i.e., a high ratio]. When the ratio is a breathtaking 500 to 1, however, the award must surely 'raise a suspicious judicial eyebrow.'" 517 U.S. at 583 (quoting *TXO*, 509 U.S. at 481 (O'Connor, J., dissenting)). This statement strongly suggests that judges should not lightly deem a ratio excessive under the second *Gore* guidepost. The Supreme Court found a compelling reason to hold the ratios excessive in *Gore* and *State Farm*: they were breathtakingly large. As Judge Restani acknowledges, however, this reason is absent here, because a 13:1 ratio certainly is not breathtaking. Even if we were to assume that a ratio need not be breathtaking to be excessive, holding that a 13:1 ratio is not

---

[9]Judge Restani cites a case, *Phelps v. Louisville Water Co.*, 103 S.W.3d 46 (Ky. 2003), in support of her argument that the instant ratio should be higher than 1:1 because Clark's compensatory award is "not very substantial." Lead Op. at 11. In *Phelps*, the court upheld a $2 million punitive award where the compensatory award was approximately $175,000, yielding a ratio of over 11:1. 103 S.W.3d at 54. Judge Restani offers no reason why a case that approved an 11:1 ratio supports allowing a ratio of greater than 1:1 but no more than 2:1.

"within a constitutionally acceptable range" flies in the face of the Court's admonition that punitive award ratios will pass constitutional muster "[i]n most cases." This is especially true considering that (i) the ratio is only 1.3 times as large as the 10:1 ratio upheld in *TXO*[10] and (ii) the award was given to a plaintiff claiming wrongful death rather than mere economic injury.

As Judge Posner ably put it, "[t]he judicial function is to police a range, not a point." *Mathias*, 347 F.3d at 678. We recently echoed this principle: "Although individual members of the panel might have awarded fewer punitive damages if acting as a trial judge, the standard of review for such awards is deferential and, absent legal error, does not allow us to substitute our judgment for that of the trial court." *Pollard v. E.I. DuPont De Nemours, Inc.*, 412 F.3d 657, 668 (6th Cir. 2005). Today, the majority ignores this principle by policing a point rather than a range. Given the modest approach that the Court has advised us to take and the additional considerations discussed above, I would hold that the second *Gore* weighs in favor of finding the punitive award well within the bounds required by due process.[11]

## C.  Comparable Penalties

The lead opinion concludes that under the third *Gore* guidepost, the $3 million punitive damages award is excessive because it is "significantly larger" than the maximum $800,000 civil penalty Chrysler could have faced under 49 U.S.C. § 30165(a). Lead Op. at 11. This conclusion is unsupportable for at least two reasons.

First, the punitive award is hardly excessive relative to the comparable civil penalty in light of the Supreme Court's cases. If one were to read *State Farm* for the proposition that the punitive-to-compensatory ratio should have been 1:1 (as the lead opinion suggests and which I assume only for the purposes of this analysis), then the Court would have upheld a $1 million punitive award even though the comparable civil penalty was a mere $10,000 fine. 538 U.S. at 428. These figures yield a ratio between the punitive award and the comparable civil penalty of 100:1. In *Haslip*, too, the Court tolerated a large punitive-to-comparable-civil-penalty ratio. There, the Court upheld an $840,000 punitive award even though it was "much in excess of the fine that could be imposed for insurance fraud under [Alabama law]." 499 U.S. at 23 (citing ALA. CODE §§ 13A-5-11, 13A-5-12(a), 27-1-12, 27-12-17, 27-12-23). Although the Court did not specify the size of the potential fine that the award was "much in excess of," the largest fine enumerated in the statutes cited by the Court was $20,000. ALA. CODE § 13A-5-11. Thus, the punitive award in *Haslip* was upheld even though the ratio between the punitive award and the comparable civil penalty was 42:1.[12] In contrast, when the Court struck down the punitive award in *Gore*, it was 1,000 times greater than the maximum civil

---

[10]By comparison, the ratios in *Gore* and *State Farm* were 38.5 and 11.2 times greater, respectively, than the 13:1 ratio here.

[11]The arguments made in this section apply with equal force to Judge Kennedy's opinion, which relies on "the case law cited by Judge Restani" — presumably *State Farm*, *Boerner*, *Williams*, and *Phelps* — to conclude that the compensatory award in the instant case was "substantial" before offering no justification for settling on the 1:1 ratio. J. Kennedy Op. at 17.

[12]Two provisions cited by the Court also permitted the levy of a fine of "[a]ny amount not exceeding double the pecuniary gain to the defendant or loss to the victim caused by the commission of the offense." ALA. CODE §§ 13A-5-11, 13A-5-12. Another provision permitted a fine of $1,000 per violation. ALA. CODE § 27-1-12. Although these sections would appear to permit a fine larger than $20,000, which would in turn lower *Haslip*'s punitive-to-comparable-civil-penalty ratio, the Court's "much in excess" language makes it more likely that the Court was comparing the punitive award to the enumerated values in the statutes. ALA. CODE §§ 13A-5-11 (specifying fines of $20,000, $10,000, and $5,000), 13A-5-12 (specifying fines of $2,000, $1,000, and $500).

penalty.[13]  517 U.S. at 584 (comparing $2 million punitive award to $2,000 statutory fine).  The punitive-to-comparable-civil-penalty ratio in the instant case is only 3.75:1, which can hardly be characterized as excessive when it is less than the approved ratios of 100:1 and 42:1 in *State Farm* and *Haslip*, respectively, and falls far short of the 1,000:1 ratio deemed excessive in *Gore*.[14]

Second, the lead opinion's analysis relies on the flawed premise that $800,000 is the maximum comparable civil penalty.  The district court found that Chrysler could have been subject to a much larger civil penalty under Kentucky law: "suspension or revocation of corporate charters for acts of wrongdoing."  J.A. at 40 (Dist. Ct. Op. & Order at 10) (citing KY. CONST. § 205; KY. REV. STAT. ANN. §§ 271B.14-300, 502.050).  The lead opinion suggests that consideration of this potential civil penalty is inconsistent with *State Farm*.  While it is true that the Court rejected the state court's "speculat[ion] about the loss of State Farm's business license," it did so because the state court's "references were to the broad fraudulent scheme *drawn from evidence of out-of-state and dissimilar conduct*."  *State Farm*, 538 U.S. at 428 (emphasis added).  The district court in the instant case did not premise the potential loss of Chrysler's business license on "out-of-state and dissimilar conduct." Recognition of this key difference — which the lead opinion ignores — makes it clear that the district court did not run afoul of *State Farm* when it considered the potential suspension or revocation of Chrysler's Kentucky charter under the third prong of the *Gore* analysis.

Indeed, several of our sister circuits have considered the loss of a business license when conducting the *Gore* comparable-penalty inquiry.  *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 237-38 (3d Cir. 2005) (upholding a punitive award thirty times larger than the potential civil fine while noting that state law provided for penalties "up to and including the suspension and revocation of one's license"); *Greenberg v. Paul Revere Life Ins. Co.*, 91 F. App'x 539, 542 (9th Cir.) (unpublished opinion) (upholding a $2.4 million punitive award without discussing potential civil fines but "[c]onsidering that possible civil sanctions for this type of conduct include the suspension or revocation of an insurer's licenses"), *cert. denied*, 542 U.S. 939 (2004); *Mathias*, 347 F.3d at 678 (upholding a punitive award nearly seventy-five times larger than the potential civil fine where the defendant was "subject to revocation of its license, without which it [could not] operate"); *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026-27 (8th Cir.) (upholding punitive awards between $10,000 and $100,000 where the potential civil fines under two statutes were $1,000 per violation and $5,000 total, respectively; noting that a state agency had "the authority to refuse the issuance or the renewal of a motor vehicle dealer's license"), *cert. denied*, 531 U.S. 825 (2000); *see also Bielicki v. Terminix Int'l Co.*, 225 F.3d 1159, 1166 (10th Cir. 2000) (noting that state law provided for fines and suspension or revocation of the defendant's license but ultimately relying on the potential criminal punishment).

A number of state courts have similarly considered the potential loss of a business license under the third *Gore* prong.  *Myers v. Workmen's Auto Ins. Co.*, 95 P.3d 977, 992 (Idaho 2004) (upholding a $300,000 punitive award without discussing the size of potential civil fines but noting that "[e]ven the threat of losing licensure in the State did not have an immediate [deterrent] effect

---

[13]Neither the *TXO* plurality nor Justice Kennedy (who concurred in part and concurred in the judgment) compared the punitive award to the comparable civil penalty.  Justice O'Connor noted in dissent, however, that the punitive award was "orders of magnitude larger than authorized civil and criminal penalties for similar offenses." *TXO*, 509 U.S. at 482 (O'Connor, J., dissenting).

[14]The lead opinion responds to this point by noting that the third *Gore* guidepost "does not dictate what the punitive damage award should be, but rather indicates whether the award is unreasonably excessive."  Lead Op. at 11 n.17.  This rebuttal is completely unresponsive to the question of why a punitive award that is only 3.75 times greater than the comparable civil penalty is "unreasonably excessive" under the third *Gore* prong when the Supreme Court has held that punitive awards forty-two and one hundred times greater than the respective comparable civil penalties were not excessive.

upon" the defendant); *Campbell*, 98 P.3d at 418 n.8 (upholding a punitive award over 900 times larger than the potential civil fine while noting that the defendant's behavior "may . . . be justification for termination of its license"); *Dardinger*, 781 N.E.2d at 143 (upholding a $2.5 million punitive award where the potential civil fine was $3,500 per violation and the defendant could "lose its license to engage in the business of insurance in Ohio"); *Parrott v. Carr Chevrolet, Inc.*, 17 P.3d 473, 489 (Or. 2001) (upholding a $1 million punitive award where the potential civil fine was $25,000 per violation and "administrative sanctions" included "the loss of a business license"); *Krysa v. Payne*, — S.W.3d —, No. WD 64589, 2005 WL 3038853, at *11 (Mo. Ct. App. Nov. 15, 2005) (upholding a $500,000 punitive award without discussing the size of potential civil fines but recognizing that the defendant's conduct "could result in the suspension or revocation of the dealership's license"); *Hollock v. Erie Ins. Exch.*, 842 A.2d 409, 422 (Pa. Super. Ct. 2004) (upholding a $2.8 million punitive award where the potential civil fine was $5,000 per violation and the state could "suspend or revoke the offender's license"), *appeal granted in part*, 878 A.2d 864 (Pa. 2005); *Baribeau v. Gustafson*, 107 S.W.3d 52, 64 (Tex. App. 2003) (upholding a $200,000 punitive award without discussing potential civil fines but noting that "exemplary damages [are] a less severe punishment than suspension or revocation of [the defendant's] medical license"), *cert. denied*, — U.S. —, 125 S. Ct. 272 (2004); *Hundley v. Rite Aid of South Carolina, Inc.*, 529 S.E.2d 45, 63-64 (S.C. Ct. App. 2000) (upholding punitive awards of $1 million and $10 million without discussing potential civil fines but recognizing that the state "is empowered to suspend or revoke the permit of any drug dispensing facility" committing violations like the defendant's).

The lead opinion argues that in contrast to the instant case, in *Mathias* there was evidence that the defendant "gained financially from its misconduct and could likely lose its business license." Lead Op. at 12 n.18. The Seventh Circuit did not, however, condition its consideration of the loss of a business license upon the defendant's financial gain. In fact, the court did not discuss this fact at all while applying the *Gore* factors. *See Mathias*, 347 F.3d at 677 (noting the defendant's profit from misconduct in the context of a general discussion of the deterrent effect of punitive damages, several paragraphs before its discussion of comparable civil penalties). Moreover, the court made no judgment with respect to the *likelihood* of the defendant's losing its business license; instead, it simply stated that "a Chicago hotel that permits unsanitary conditions to exist *is subject to* revocation of its license." *Id.* at 678 (emphasis added). The district court used the same neutral "subject to" language in the instant case. J.A. at 40 (Dist. Ct. Op. & Order at 10). The fact is that neither *Mathias* nor any other case cited above has erected these (or any other) prerequisites to the consideration of the potential loss of a business license under the third *Gore* guidepost.

The low 3.75:1 ratio between the punitive award and the relevant civil fine, buttressed by consideration of the potential loss of Chrysler's corporate charter, compels the conclusion that the punitive award is not excessive relative to comparable civil penalties.

## D.  Summary

Because Chrysler's conduct was reprehensible, the ratio between the punitive and compensatory damages awards was neither breathtaking nor otherwise unreasonable given the circumstances of the case, and the punitive damages award was in line with comparable civil penalties, I would affirm the district court and sustain the full $3 million in punitive damages.